UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID AGUSTUS MCGOWAN,<br><br>Defendant. | No.  1:18-cr-253-DAD-BAM<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. No. 269) |

This matter is before the court on defendant David Agustus McGowan's motion to suppress all evidence obtained from law enforcement's traffic stop and search of his vehicle. (Doc. No. 269.) Defendant filed the pending motion on May 9, 2022, pursuant to Federal Rules of Criminal Procedure 12, Eastern District of California Local Rule 430.1, and the Fourth Amendment of the United States Constitution. (*Id.* at 8.) The government filed an amended opposition to the motion on June 4, 2022 (Doc. No. 271), and defendant McGowan filed his reply thereto on June 21, 2022 (Doc. No. 277).

A hearing on defendant's motion was held on July 11, 2022, at which Assistant United States Attorney Karen Escobar appeared on behalf of the government, and Assistant Federal Defender Christina Corcoran appeared on behalf of defendant McGowan. (Doc. No. 279.) Following that hearing, the court granted the requests for submission of supplemental briefing and later for an extension of time to file the further briefing. (Doc. Nos. 279, 288.) On August 1,

1

2022, the government filed a declaration of Homeland Security Investigations ("HSI") Special Agent Andres Varela with exhibits in support of its opposition to the pending motion. (Doc. No. 281.) On September 16, 2022, defendant McGowan filed a reply to the government's supplemental declaration. (Doc. No. 291.) Thereafter, the motion was taken under submission. For the reasons set forth below, the court will deny defendant McGowan's motion to suppress evidence.

## BACKGROUND

Defendant McGowan challenges the stop and subsequent search of his truck and trailer by Arizona Department of Public Safety ("DPS") troopers, who were acting in coordination with federal agents in Fresno conducting the underlying criminal investigation that resulted in the indictment in this case.

In 2018, the Drug Enforcement Administration ("DEA") and HSI began an investigation into defendant McGowan's co-defendant in this case, Patrick Maldonado, based on information that Maldonado was involved in the distribution of large quantities of cocaine and marijuana and had a history of involvement in drug trafficking. (Doc. Nos. 271 at 6; 281 at 2.) As part of that investigation, the DEA and HSI sought and obtained a court order authorizing the interception of wire and electronic communications on Maldonado's phones. (Doc. No. 271 at 6.) Based on wire intercepts on November 7, 2018, DEA and HSI agents believed that Maldonado was coordinating with one of his sources of supply, co-defendant Tan Minh Vo, for the delivery of 92 pounds of marijuana to co-defendant Halen Frazier in Kansas City, Missouri. (*Id.*) After intercepting more telephone calls on November 8, 2018, federal agents believed that an individual had left Fresno that morning driving a truck with an attached trailer outfitted with a hidden compartment packed with marijuana. (*Id.* at 7.) In these intercepted calls, the man driving the truck was referred to as "Mack" or "Mackie." (Doc. Nos. 271-1, 271-2, 271-3, 281-1.)

On the evening of November 8, 2018, a call took place between Frazier and Maldonado, wherein Frazier advised that he was in contact with Mack who had been stopped by highway patrol about one hour earlier in Arizona because the trailer's lights "came undone," but Frazier also reported that "he's cool" because the officer just gave Mack a "fix-it ticket." (Doc. Nos. 271

2

at 7; 271-1 at 3.) Frazier also advised Maldonado that the plug to the lights had become disengaged, and he indicated that McGowan had gone to a hotel and would get it fixed in the morning when he got up. (Doc. Nos. 271 at 7; 271-1 at 3–4.) That same evening, the government intercepted a series of other calls, in which Maldonado discussed with other individuals how Mack was pulled over due to the trailer's broken taillights. (Doc. Nos. 271-1, 271-2, 271-3, 271-4.)

The agents monitoring the wire intercept contacted the Arizona DPS and confirmed that an Arizona trooper had in fact stopped a person by the name of David McGowan that evening for non-functioning taillights on a trailer and issued him an equipment repair order, otherwise known as a "fix-it ticket." (Doc. Nos. 271 at 8; 271-5 at 6; 271-6 at 4.) The federal agents informed DPS troopers of their ongoing drug trafficking investigation and indicated they suspected that the trailer McGowan was driving contained marijuana in hidden compartments based on the intercepted calls. (Doc. No. 281 at 9.) At the request of the federal agents, the state troopers then coordinated to search the truck and trailer for drugs using an investigative technique which the government has referred to as a "wall stop," designed to avoid compromising a wiretap that is being utilized in an ongoing criminal investigation. (Doc. Nos. 271-5 at 7; 271-6 at 4; 281 at 10.) In short, this investigative technique involves a pretextual vehicle stop, ostensibly based on a traffic violation, so the driver is unaware that he is actually a suspect in a larger investigation. (Doc. No. 281 at 10.) Here, after conferring with the federal agents, DPS Trooper Roanhorse, Trooper Phillips, Trooper Laconte, and Trooper Ibarra located McGowan's truck and trailer near where McGowan was initially stopped in Chambers, Arizona. (Doc. Nos. 271 at 8; 271-6 at 4; 281 at 9.)

The next morning, on November 9, 2018, at approximately 6:28 a.m., Trooper Phillips effected a stop of McGowan's truck and trailer. (Doc. No. 269-1 at 7.) When Trooper Phillips told McGowan that he had pulled him over for the trailer taillights issue, McGowan showed him the equipment repair order and explained that he had just been pulled over for the same issue the previous night. (Doc. Nos. 269 at 10; 271 at 10.) McGowan told Trooper Phillips that he was on his way to get the taillights fixed. (Doc. No. 269 at 10.) Rather than letting McGowan continue

1   on to get the taillight repaired, Trooper Phillips continued the detention, ostensibly to issue the
2   same repair order that his colleague, Trooper Roanhorse, had issued the night before.  (*Id.*)
3   Trooper Phillips did not mention the federal drug trafficking investigation during the stop of
4   McGowan or in the police report he completed after the vehicle stop.  (Doc. No. 269-1.)
5         The parties dispute whether Trooper Phillips obtained valid consent from McGowan to
6   search the truck and trailer following the early morning vehicle stop on November 9, 2018.  (Doc.
7   Nos. 269 at 28–36; 271 at 23–25.)  When troopers entered the trailer, they reportedly smelled a
8   strong odor of marijuana.  (Doc. No. 271-7 at 2.)  Troopers then determined the trailer's front
9   wall was fake.  (*Id.*)  They removed many screws from the trailer's front wall, where they located
10  hidden compartments containing vacuum-sealed bags of marijuana.  (*Id.*)  They also removed the
11  screws to the workbench in the trailer, where they located more vacuum-sealed bags of
12  marijuana.  (*Id.*)  The troopers did not remove the packages of marijuana at the scene of the stop.
13  (Doc. No. 271 at 13.)  Instead, they transported the vehicle to a nearby DPS office to further
14  dismantle the hidden compartments of the trailer.  (*Id.*; Doc. No 271-6 at 6.)  There, troopers
15  removed from the hidden compartments 329 packages of marijuana weighing 384.6 pounds, 31
16  packages of edibles containing THC and weighing 78.2 pounds, and five packages of THC syrup
17  weighing 44.4 pounds, as well as $1,629 in cash.  (Doc. No. 269-1 at 14.)

**LEGAL STANDARD**

19        The Fourth Amendment states, "[t]he right of the people to be secure in their persons,
20  houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."
21  U.S. Const. amend. IV.  The Fourth Amendment applies to the seizure of a person, even if that
22  seizure does not rise to the level of an arrest.  *Terry v. Ohio*, 392 U.S. 1, 17 (1968).  Traffic stops,
23  "even if only for a brief period and for a limited purpose," are "seizures" within the meaning of
24  the Fourth Amendment and therefore are "subject to the constitutional imperative that [they] not
25  be 'unreasonable' under the circumstances."  *Whren v. United States*, 517 U.S. 806, 809, 810
26  (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Colin*, 314
27  F.3d 439, 442 (9th Cir. 2002) ("The Fourth Amendment's prohibition against unreasonable
28  searches and seizures applies to investigatory traffic stops.")  The automobile exception allows

law enforcement to search a vehicle without a warrant when they have probable cause[1] to do so. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001). This is the case regardless of whether a traffic violation has occurred. *United States v. Ramirez*, 473 F.3d 1026, 1031 (9th Cir. 2007) (determining in a case involving a challenged pretextual traffic stop that it did not "matter whether [the officers] had valid grounds to make the traffic stop" and, rather, that "if the officers had probable cause, then the seizure and search of the vehicle will be justified."); *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012) ("Under the automobile exception to the warrant requirement, police officers may stop and search a car if they have probable cause to believe it contains contraband, regardless of whether a traffic violation has occurred or a search warrant has been obtained.").

## ANALYSIS

In his pending motion to suppress evidence, defendant McGowan contends that Trooper Phillips did not have reasonable suspicion or valid consent to conduct the second stop of the vehicle he was driving or the subsequent investigatory detention and search of his truck and attached trailer. (Doc. No. 269 at 19–36.) As to the traffic stop, McGowan argues that although Trooper Phillips may have had reasonable suspicion when he initially stopped the truck and trailer based on the broken taillight, that reasonable suspicion dissipated when McGowan produced the courtesy repair order written by Trooper Phillips's colleague, Trooper Roanhorse, the night before. (*Id.* at 19.) Moreover, McGowan argues that Trooper Phillips unreasonably prolonged the stop by engaging in extensive and unreasonable questioning unrelated to the reasons for the traffic stop. (*Id.* at 22.)

In its opposition to the pending motion, the government argues that the traffic stop was justified for two independent reasons. First, the government contends that the collective knowledge of law enforcement justified the stop even though Trooper Phillips was "walled-off"

---

[1] Probable cause exists when the "facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." *United States v. Ibarra*, 345 F.3d 711, 716 (9th Cir. 2003); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) (probable cause must be assessed "in light of the totality of the circumstances").

from the underlying drug trafficking investigation, meaning that he was generally unaware of the information then known to DEA and HSI agents. (Doc. No. 271 at 10–16.) Second, the government contends that McGowan's non-functioning taillights permitted Trooper Phillips to stop him and issue a new repair order, despite the fact that Trooper Phillips knew McGowan had been given a repair order the night before by Trooper Roanhorse and that McGowan had five days to repair the condition under state law. (*Id.* at 21–23.) As to the search, the government argues that it was lawful because McGowan gave voluntary consent to search his truck and trailer. (*Id.* at 23–25.) Because the court concludes that the collective knowledge of law enforcement at the time DEA and HSI agents requested that DPS troopers perform a walled-off traffic stop provided probable cause to believe McGowan's trailer contained evidence of a crime, the court need not address the parties' other arguments.

The collective knowledge of law enforcement officers may be used to establish probable cause, meaning that an officer may rely on the information provided by other officers to justify a stop. *See United States v. Hensley*, 469 U.S. 221, 229–32 (1985) (concluding that police officers of one police department were entitled to rely on a flyer issued by another department when the flyer had been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person had committed an offense, even though police who effected the stop were unaware of the specific facts that established reasonable suspicion); *Ramirez*, 473 F.3d at 1037 ("Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment."); *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (concluding that an officer's "testimony that he had received intelligence regarding [the defendant] was sufficient for the purpose of establishing probable cause under the so-called "collective knowledge doctrine").

The Ninth Circuit has also recognized that the collective knowledge doctrine applies "in at least two situations": (1) where "law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned" and (2) "where

6

an officer (or team of officers), with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Ramirez*, 473 F.3d at 1032, 1033. The second situation addressed by the Ninth Circuit in *Ramirez* is frequently the basis for probable cause supporting a stop such as the one executed here. *See id.* at 1033; *Benard*, 680 F.3d at 1208, 1210 (finding that a state trooper's vehicle search was constitutional where FBI agents requested that the trooper conduct a "wall stop" on the defendant's vehicle and holding that "the officer who conducts the vehicle search does not need to be aware of the facts establishing probable cause, so long as he is acting on instructions delivered by an officer who has probable cause"); *United States v. Rodriguez*, 831 F.2d 162, 165 (7th Cir. 1987) (finding that officers properly relied on the DEA's reasonable suspicion that the defendant was transporting drugs, even though DEA agents did not convey any details to the officers conducting the stop about the ongoing investigation); *United States v. Sanchez-Pedraza*, No. 21-cr-00439-BLF-3, 2022 WL 1569290, at *4 (N.D. Cal. May 18, 2022) (finding that the "wall stop" of the defendant was supported by probable cause derived from wiretaps that a drug transaction was likely to occur where the traffickers showed up at the time and place stated on the intercepted phone call, a bag was transferred to defendant, and the vehicle the defendant was driving was relayed to officer who subsequently stopped it, even though none of the wiretap interceptions involved or referred to the defendant).

When law enforcement officers rely on information obtained from other officers in effecting stops, the question of the constitutionality of the stop "turns on whether the officers who [conveyed the information] possessed probable cause to make the arrest. It does not turn on whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance." *Hensley*, 469 U.S. at 231. According to the Supreme Court, this is "a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction." *Id.* at 231; *see also United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976) ("We recognize that effective law

7

enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."). Thus, the critical question here is whether the information collectively known to law enforcement officers provided probable cause to believe that defendant McGowan's trailer contained illegal controlled substances.

In his supplemental briefing, defendant McGowan contends that probable cause was lacking because the intercepted calls did not contain any discernable reference to drugs, did not mention McGowan by name, and merely referenced "Mack" or "Mackie" who had an issue dealing with a broken plug that impacted the lights on his trailer. (Doc. No. 291 at 2.) Specifically, defendant McGowan argues that the intercepted conversations concerning other parties do not amount to individualized reasonable suspicion sufficient to justify the stop of the vehicle he was driving. (*Id.* at 2–3.) However, probable cause is determined "in light of the totality of the circumstances," *Brooks*, 610 F.3d at 1193, and here those circumstances include the calls on Maldonado's phones intercepted pursuant to the court authorized wiretap, which made clear that Maldonado was in the process of shipping a large quantity of marijuana through a third party by means of a truck and trailer with a hidden compartment and that the truck and trailer had been stopped in Arizona for non-functioning taillights that evening.[2] In addition, although the

---

[2] Specifically, on November 7, 2018, federal agents intercepted the following telephone calls. In one such conversation, Vo asked Maldonado to tell him the hotel that he wanted Vo to book. (Doc. No. 281-1 at 2–3.) A few minutes after that call, Maldonado called Frazier, telling him he was thinking about "the Adam's Mart [sic] by the stadium." (*Id.* at 5.) Frazier commented, "That's, that's hella close for me" and also that it was "right off the freeway, too." (*Id.*) A few hours later, Vo advised Maldonado that some flights had been delayed and apologized for messing up "like last time" and keeping Maldonado's "guy waiting again." (*Id.* at 8.) Vo told Maldonado that he would have 28 the next day and referenced a 92 as well. (*Id.* at 9.) In a later call Vo explained to Maldonado that his farm had been robbed the day before. (*Id.* at 15.) Vo assured Maldonado that everything would be there by "six o'clock." (*Id.* at 16.) Vo also stated that he had sent Maldonado tracking information for "the packet," and Maldonado replied, "I don't like to do tracking." (*Id.*) Vo stated to Maldonado, "yeah, the ninety-two (92) yeah? Uh, your, your, your guy gonna be happy. Guarantee it. Okay." (*Id.* at 18.) The next day, November 8, 2018, federal agents intercepted the following calls. Maldonado and Frazier discussed that an individual had left that morning. (*Id.* at 20.) Their conversation reflected that the driver was on the road and Maldonado and Frazier were glad the driver would not be traveling in weekend traffic. (Doc. Nos. 281 at 5;

phone calls did not reflect specific use of the word "marijuana" or other controlled substances, there was strong circumstantial evidence that drug trafficking was occurring, including the speakers' references to "animal cookies" and "sour OGs," which are both popular strains of marijuana, and to "fire," which is a common slang term used to describe high quality marijuana. (Doc. Nos. 281 at 6, 7; 281-1; 281-2; 281-3.) It is also the case that federal agents did not know McGowan's true identity until they contacted the Arizona DPS and asked whether a person had been stopped and issued a fix-it ticket in Arizona on the night in question. However, at that point, federal agents learned that David McGowan had been stopped that same night for broken taillights on his trailer and released after Trooper Roanhorse issued an equipment repair order to him, thus corroborating Maldonado's intercepted call in which he discussed that "Mack" had been stopped by highway patrol in Arizona because the trailer lights "came undone," but "he's cool" because the officer just gave Mack a "fix-it ticket." (Doc. Nos. 271 at 7; 271-1 at 3, 271-3,

---

281-1 at 22.) Maldonado told Frazier that "they" had worked outside during the night before, "closing everything up" and that there was a pattern to the work that Frazier would "have fun" with when it came to that time, but that Maldonado would help him with it through FaceTime. (Doc. No. 281-1 at 22–23.) Later in that call, the two discussed a trailer and a person named "Mackie." (Doc. No. 281-1 at 25.) Specifically, Frazier asked Maldonado if he put the tag of the other trailer on, and Maldonado said he had. (*Id.*) Frazier asked if they had taken the tires out of the trailer and stated "I told fuckin' Mackie's dumb ass." (*Id.*) Agent Varela believed that when Maldonado said they had worked "closing everything up" the night before, he was referring to closing hidden compartments in a trailer, and that when Maldonado stated that there was "a pattern," he was referring to a code or specific steps that needed to be taken in order to access the hidden compartment in the trailer. (Doc. No. 281 at 5.) In a call at 4:42 p.m. on November 8th, Maldonado asked Frazier to take a "wild guess" to see "how many that thing will fit, the new one." (Doc. No 281-3 at 2–3.) Frazier guessed 350 and Maldonado stated Frazier hit it "right on the nose." (*Id.* at 4.) When Frazier asked Maldonado if it was packed tight, Maldonado replied "pretty damn tight" and explained that they could have attempted to pack more but ran the risk of "popping them." (*Id.*) Maldonado assured Frazier that none of the shipment had been smashed up, stating, "we just slid 'em in," but a few had been messed up by the machine, while trying to work so many. (*Id.*) Frazier asked how many did Jesse throw and Maldonado stated "thirty" and indicated ten were "real good," and two and one half were "fire, top, top shelf . . . . It's Animal Cookie." (*Id.*) Frazier asked about "the other ones," and Maldonado replied that there were some "Sour OGs and I put them in the big square cuz they are that fire, but we got a lower number." (*Id.* at 5.) "Animal cookies" and "sour OGs" are popular marijuana strains, and "fire" is a common slang term used to refer to high quality marijuana. (Doc. No. 281 at 6.) Based on these intercepted conversations, Agent Varela had probable cause to believe that Maldonado's marijuana shipment was destined for Frazier, being delivered by a driver with the moniker "Mack" or "Mackie." (Doc. No. 281 at 4.)

9

271-4.).[3]  This information supplied a strong basis for federal agents to believe that McGowan was the "Mack" referenced in the intercepted calls and that he was working with Maldonado to transport marijuana. Under the "totality of the circumstances," this information is more than sufficient "to warrant a reasonable person to conclude that contraband or evidence of a crime [would] be found" upon a search of the trailer. *See Brooks*, 610 F.3d at 1193; *Ibarra*, 345 F.3d at 716.

In addition, Trooper Phillips was authorized to conceal the true nature of his probable cause to search the trailer—drug trafficking—with the ostensible taillight infraction.  It was acceptable for the vehicle stop to be disguised as a traffic stop to ensure the integrity of HSI and DEA's ongoing wiretap and drug trafficking investigation.  *See United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (rejecting a challenge based upon an officer's deliberate lie as to the reason for a vehicle stop because "[t]he standard for determining whether probable cause [ ] exists is an objective one; it does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop."); *United States v. Chavez*, 534 F.3d 1338, 1348 (10th Cir. 2008) ("'[D]isguising the stop as a 'traffic stop' was a valid law enforcement tactic calculated to' . . . safeguard . . . the integrity of the DEA investigation.") (citation omitted). This court's conclusion that the federal agents' knowledge can be imputed to DPS troopers forecloses McGowan's other arguments.

In sum, the court finds that Trooper Phillips had probable cause to stop McGowan and search his trailer for evidence of marijuana trafficking pursuant to the collective knowledge doctrine.

---

[3] During an intercepted conversation the night of November 8, 2018, Frazier told Maldonado that Frazier was "dealing with Mack and shit" and had received a call from him. (Doc. No. 271-1 at 3.) Frazier reported that Mack had been pulled over about an hour before by "Highway Patrol" in Arizona due to the lights of the trailer being out. (*Id.*) Maldonado asked Frazier if "he," referencing "Mack," was "cool." (*Id.*) Frazier responded that "the dude wrote him a fix-it ticket or some shit," and that "it didn't go any further than that." (*Id.*) When Maldonado asked Frazier if "he" had fixed it, Frazier said "he" had not, but indicated "he" was going to a trailer place in the morning to get it fixed. (*Id.* at 4.) A number of other intercepted calls then took place between Maldonado and others in which Mack and the problem with the trailer were discussed. (Doc. Nos. 271-1, 271-2, 271-3, 271-4.)

**CONCLUSION**

Because federal agents had probable cause to search McGowan's trailer based on information learned as a result of their wiretap investigation and informed Arizona DPS troopers that they believed the trailer contained marijuana in hidden compartments, Trooper Phillips also had probable cause to effect the stop and search of the trailer. The existence of probable cause also permitted troopers' warrantless search of the trailer. The evidence discovered as a result of that valid vehicle stop is therefore not subject to suppression.

Accordingly, defendant's motion to suppress the evidence seized during that traffic stop and vehicle search (Doc. No. 269) is denied and the Clerk of the Court is directed to reassign this case to U.S. District Judge Ana I. de Alba for all further proceedings in this action before the district court. The parties are advised that all future filings in this case in this district court shall bear the new case number of 1:18-cr-00253-ADA.

IT IS SO ORDERED.

Dated:   **October 11, 2022**                           /s/ Dale A. Drozd
                                                                                   UNITED STATES DISTRICT JUDGE